STATE v. H. W. MATSEN.[1]

March 3, 1933.

No. 29,377.

*Alva R. Hunt,* for appellant.

[1]Reported in 246 N. W. 861.

A brief was filed on behalf of the state by *Henry N. Benson,* former Attorney General, and *Sam G. Gandrud,* County Attorney.

Upon hearing of the case there was an appearance and argument on behalf of the state by *Harry H. Peterson,* Attorney General, and *Roy C. Frank,* Assistant Attorney General.

WILSON, CHIEF JUSTICE.

Defendant appealed from an order denying his motion for a new trial. He is a young poultry farmer living near Kingston in Meeker county. In 1930 he commenced hauling his eggs to Minneapolis to a better market. His neighbors sent their eggs along. The volume indicated possibilities. He called together 30 to 40 egg-producing farmers in his community. They there organized the Kingston Egg Producers Association. They elected seven directors, a president, a secretary, and a treasurer. Defendant was chosen manager. His brother was employed to candle and grade the eggs, receiving therefor 15 cents per case. A trucker was engaged to haul them to market for 25 cents per case. Defendant was to receive five cents per case for his services as manager. It is not here important that he later acquired a truck of his own and did the hauling at a cheaper rate per case. There was no membership fee. Every farmer bringing eggs became a member.

The association rented a room in Kingston in which to transact its business at a rental of ten dollars per month. It applied for and obtained a state egg-buyer's license. Before members were to receive pay for their eggs all expenses and losses were supposed to be prorated and deducted. A small amount or percentage was to be retained to meet incidental expenses. In theory every member should have contributed his proportionate share of expense of operation based upon the volume of business involved. In practice this would have been troublesome and perhaps required more computation than was ever given to it.

The association apparently prospered in volume. From April 28, 1931, to January 6, 1932, it handled 177,000 dozens of eggs. It took

in $38,424.69 and paid out $39,771.50, leaving a deficit of $1,346.81. The candler employed help to do his work and paid therefor from his 15 cents per case. The eggs as brought in and candled were kept in mass, and the eggs then lost their identity as to ownership. A member was entitled to share in the net returns in proportion to the quantity and grade of his eggs.

Hundreds of egg cases were bought at 30 cents each. They were furnished to the members without keeping an accurate record therefor, and it is claimed that many were never returned. When eggs were sold by the association the cases went with them.

For a while eggs sometimes remained on hand at Kingston from Tuesday until Friday. In hot weather this carried some peril. The manager would deliver the eggs in Minneapolis and receive the returns a week later. Instead of waiting for the returns and definitely figuring out the exact net returns to which the contributors were entitled, defendant frequently gave checks to the contributing members based upon the market and the grade of eggs as graded at Kingston. When the eggs were given a lower grade in Minneapolis, as sometimes happened, this resulted in a shortage or shrinkage in substantial amounts and materially contributed to the final deficit. Loss of egg cases also added to the loss. There were other minor matters that necessarily added to the net loss. It is not clear that any deductions were in fact ever computed to take from the members the money necessary to pay rent, light, stationery, postage, etc.

At the commencement of the association's business it carried an account in the bank in the defendant's name. He talked with the president of the bank about changing the account to the name of the association. Some uncertainties caused a delay in the change, and it was neglected and not made. All receipts from eggs sold by the association were deposited in the checking account in the name of defendant, and he gave his personal checks in disbursing the money to those who had brought in eggs, accompanying the same with a statement made on a printed account form with a heading:

"Kingston Egg Producers
Kingston, Minnesota
Buyers for
Land O'Lakes Creameries, Inc.
Egg Receiving Record."

The association handled cod-liver oil and other feeds and ingredients used by poultry men. It kept no minutes of directors' meetings. Defendant's exhibit No. 1 is a sample of its business methods. It consists of a single sheet of paper upon which is the following, authenticated by the signatures of the seven directors:

"We the Directors of the Kingston Egg Producers: Do hereby put a new by law into effect.

"That no more eggs accepted in the evenings, and that all eggs must be in by Wednesday, in order to be paid the following Wednesday. The candlers can't stand candling all day and nite both. Please cooperate with us and give the boys a chance. This means everybody. No exceptions if we intend to keep this going."

On December 17, 1931, J. Rintala, a member of the association, delivered to it four cases of eggs. On December 22, 1931, defendant gave him a check for $26.39 therefor. The usual statement accompanied the check. It is not made to appear that Rintala was charged 45 cents per case or any other amount. If not, the association lost at least $1.80. If defendant took that out before fixing the price on the four crates of eggs involved, no record was made of it. If so, it is not surprising that there were undisclosed losses. Rintala did not present his check for payment until January 7, 1932, when payment was refused for want of funds. Had he presented it any day before that it might have been paid. That fact, however, is not the controlling one.

. Defendant by information was put on trial and convicted of grand larceny in the second degree on the theory that he had stolen Rintala's $26.39.

This conviction rests upon the theory that defendant was Rintala's agent in the sale of the four cases of eggs, that as such agent

he received the $26.39 belonging to Rintala, and that he converted it to his own use with a felonious intent. The conviction is not supported by the facts, from which it appears as a matter of law that defendant was the agent of the association and not the agent of Rintala.

Obviously there was an association, though crudely organized and inefficiently and carelessly managed. The methods of the officials were unbusinesslike. It is clear, however, that the members turned their eggs in to the association, trusting it to account therefor; and, after the identity of the source of the eggs was lost by the common mixture, the association necessarily held the title thereto. Defendant was employed by the association, not by Rintala.

The record does not indicate that defendant actually misappropriated these funds or any funds. The proceeds were deposited in the bank account and there apparently credited on an overdraft which the association owed the bank. He did not use this account in his own personal affairs other than in relation to his own eggs, which he turned in to the association as one of its members.

The deficit seems to have resulted from inefficiency of the management and not from defendant's criminal intent. The fact that he left the state in January, 1932, under circumstances which caused the state to say that he "ran away" does not change the fundamental and controlling facts. He voluntarily came back. He was young and inexperienced, and his flagrant failure in management and the resulting loss may have humiliated him almost as much as if he had been conscious of criminal wrong.

The order is reversed with directions to enter an order for judgment of dismissal.

OLSEN, JUSTICE, took no part.